**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| LET EXPERIENCED PILOTS FLY, INCORPORATED., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:24-cv-736 |
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, | ) ) ) | |
| Defendant. | ) ) | |

## FIRST AMENDED COMPLAINT FOR BREACH OF DUTY OF FAIR REPRESENTATION

Plaintiff Let Experienced Pilots Fly, Incorporated ("Plaintiff" or "LEPF") brings this action against defendant Air Line Pilots Association, International ("ALPA" or "Defendant") for its breach of the duty of fair representation under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq., and states as follows:

### SUMMARY OF CLAIMS

1.      Plaintiff LEPF, also known as the Raise the Pilot Age Coalition, is a professional trade association exempt from federal income tax under Section 501(c)(6) of the Internal Revenue Code of 1986 and organized under Illinois' General Not For Profit Corporation Act of 1986, with its registered offices in Arlington Heights, Illinois. LEPF's members consist of thousands of pilots and other professionals in the aviation industry.

2.      Most of LEPF's members are pilots who are or recently have been employed by various airlines in the United States operating under the Federal Aviation Administration's (FAA) "Part 121" regulation, 14 C.F.R. § 121.1, et seq. Most of LEPF's pilot members are older and have

more than 20 years of experience flying Part 121 commercial airplanes in the United States and internationally. Most of LEPF's members are members of and represented by Defendant ALPA.

3.     ALPA is a labor union representing more than 77,000 pilots at 43 United States and Canadian airlines, making it the world's largest airline pilot union. The majority of ALPA's members are younger, more junior pilots, with more political power and internal influence, and thus more favored by the union than LEPF members (and other senior pilots).

4.     Section 121.383(c) of Title 14 of the United States Code (the Age 65 Rule) currently prohibits any air carrier from using the services of any person as a pilot, and prohibits any person from serving as a pilot, on an airplane engaged in operations under Part 121 if that person has reached his or her 65th birthday. Part 121 covers operations of large commercial passenger aircraft, smaller propeller aircraft with 10 or more passenger seats, and common carriage operations of all-cargo aircraft with a payload capacity of 7500 pounds or greater.

5.     This action arises out of ALPA's breach of its duty of fair representation owed to LEPF members and other pilots represented by ALPA in connection with ALPA's ongoing campaign against certain legislation pending in Congress known as the *Let Experienced Pilots Fly Act* ("LEPF Act"). The LEPF Act would increase the Part 121 airline pilot retirement age from 65 to 67 while requiring that air carriers maintain rigorous medical and training requirements to keep passengers safe.

6.     As part of its union activities to which the duty of fair representation applies, ALPA is actively engaging in a public and private campaign against raising the mandatory retirement age for Part 121 pilots from 65 to 67 for the purpose of benefiting the more politically powerful younger, generally more junior, pilots at the expense of the older, generally more experienced

pilots. ALPA's actions and statements are intentionally discriminating against and harming the older pilots it represents as exclusive bargaining agent to favor the interests of the younger pilots.

7. ALPA's "anti-senior" pilot campaign includes making unsupported claims against the pending Age 67 legislation; intentionally misstating relevant facts; and making false, defamatory, and offensive statements against ALPA's senior pilot members concerning their alleged inability to pilot Part 121 planes safely and efficiently after their 65th birthday without disruption to the airline industry generally or injury or death to passengers. In other words, ALPA is unfairly, unreasonably, and through fraud and deception intentionally attacking a minority group of its own members to wrongfully benefit the majority at the expense of the minority rather than represent the interests of all its members fairly and in good faith as required by ALPA's duty of fair representation.

8. ALPA is continually breaching its duty of fair representation to LEPF members and other represented pilots its ongoing anti-senior pilot campaign through union advocacy activities including public advertisements, statements on its website, posts on social media, and aggressive and widespread lobbying efforts against the pending Age 67 legislation. ALPA's purported reasons and representations in opposition to the Age 67 Rule are disingenuous, misleading, or false, and are intended to obfuscate the real purpose for ALPA's anti-senior pilot campaign: to get the "65-year-olds" out of the cockpits to make room for the younger ALPA pilots and speed up their progression to the more lucrative and desirable senior pilot positions.

9. ALPA's wrongful actions are intentionally directed against an older, more senior minority group within the union and are arbitrary, discriminatory, and done in bad faith. ALPA is actively spreading lies and innuendo against this minority group, whose members faithfully pay millions of dollars in union dues each year with the expectation that ALPA will fairly and in good

faith represent their interests and abide by ALPA's duty of fair representation owed to all ALPA members.

10. ALPA, being the largest, loudest, and most wide-spread group actively opposing the LEPF Act and its provisions for raising the retirement age of Part 121 pilots from 65 to 67 is negatively affecting the chances that the pending legislation will be passed. The legislation is largely unopposed by the major airlines and generally supported by the regional and smaller airlines. In fact, none of the major airlines have come out publicly against the LEPF Act.

11. As stated more fully below, however, ALPA's anti-senior pilot campaign includes false and misleading claims being made by ALPA on behalf of the *airlines* which are directly contrary to the basic tenet that ALPA is required to represent the interests of its pilot members, <u>not</u> the interests of the pilots' *employers.*

12. ALPA's actions are harming the interests of LEPF members, which harm is and will be irreparable absent court action. Even if the LEPF Act does pass, the immeasurable harm to the older pilots from ALPA's defamatory statements, blatant age discrimination, and general anti-senior campaign will continue, and without court intervention through injunctive relief and a declaratory judgment in Plaintiff's favor that ALPA has and continues to breach its duty of fair representation, ALPA will be emboldened to continue its unlawful conduct against LEPF's members and other older pilots it represents.

## THE PARTIES AND LEPF'S STANDING

13. LEPF is a professional trade association exempt from federal income tax under Section 501(c)(6) of the Internal Revenue Code. LEPF's stated purpose in its bylaws, *inter alia*, is to operate exclusively for/to the promulgation of current and future United States Part 121 airline

pilots who can obtain and maintain the medical certifications and other requirements to continue their flying careers past the current mandatory retirement age of 65.

14.     Defendant ALPA, an unincorporated association, is the certified collective bargaining representative under the RLA for all its active pilot members, including the majority of LEPF members. At all times relevant herein, ALPA owed a duty of fair representation to LEPF members regarding all actions taken by ALPA relating to their employment with the airlines, including ALPA's advocacy in opposing the LEPF Act pending in Congress.

15.     LEPF's pilot members are suffering immediate and threatened injury because of the actions of ALPA of the sort that would make out a justiciable case had the members themselves brought suit individually. LEPF has standing to bring the claims asserted herein because: (1) its pilot members would otherwise have standing to sue in their own right, (2) the interests LEPF seeks to protect are germane to LEPF's purpose, and (3) neither the claims asserted, nor the relief requested requires the participation of individual members in this lawsuit.

16.     The statements and actions by ALPA alleged to have breached ALPA's duty of fair representation have been continuous and ongoing, and ALPA's wrongful conduct on which LEPF's claims are based occurred within and prior to six months before the filing of this lawsuit on January 27, 2024. ALPA's bad faith, discriminatory, and arbitrary conduct towards the older, more senior pilot minority within the union continues today.

## JURISDICTION AND VENUE

17.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that it arises under the laws of the United States, specifically the RLA, 45 U.S.C. § 151 et seq.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because ALPA resides in this district and is subject to this Court's general personal jurisdiction over it with respect

to this action. ALPA has continually maintained offices in Rosemont, Illinois, for many years and does business in this judicial district, and at least some of ALPA's officers making up ALPA's Executive Board, which directs ALPA's anti-senior pilot campaign live and work in this district.

19.     ALPA's policies are established by its Board of Directors and Executive Board. Local Councils consist of ALPA members who are all employed by the same airline. Each Local Council elect representatives who serve as members of the Master Executive Council ("MEC") for the airline and as members of ALPA's Board of Directors.  ALPA's Executive Board consists of the leader (chairman) of each airline MEC, including the MEC for United Airlines in this district. A substantial part of the events or omissions giving rise to Plaintiff's claims, including ALPA's anti-senior pilot campaign described herein, therefore occurred in this district.

## COMMON ALLEGATIONS

A.     <u>Current Part 121 Pilot Retirement Age ("Age 65 Rule").</u>

20.     In 1959, the FAA placed the first age limit on pilots flying commercial airlines at age 60. It prohibited any persons over 60 from serving as a pilot in air carrier operations regulated under Part 121 of the FAA regulations. That age limit ("Age 60 Rule") was enacted based on the presumption that health conditions tend to increase with age and can lead to pilot incapacitation during flight, although the studies relied on by the FAA to justify the Age 60 Rule never established a correlation between accident rates and the increased age of pilots.

21.     In November 2006, the International Civil Aviation Organization ("ICAO"), the international aviation oversight body operating under the authority of the United Nations of which most developed nations are signatories, adopted a standard which allows airline pilots of Member States to fly until age 65 if there are one or more additional pilots in the cockpit.

6

22.     Prior to adopting the age 65 standard, ICAO conducted an international survey of flight safety data and found no evidence to support an upper age limit of 60 years of age for commercial pilots, and medical and aging experts agreed there was no medical rationale for the arbitrary Age 60 Rule. There was no safety risk analysis of the effect of a change to the standards, only a cursory review of studies done by other organizations was conducted. In fact, neither ICAO nor any related agency conducted any research into pilot health/age before the upper age limit was changed to 65.

23.     When ICAO announced that it would be adopting a new age 65 standard, there was also legislation proposed in Congress to raise the existing, arbitrary Age 60 Rule. In 2007, Congress voted unanimously to pass the *Fair Treatment for Experienced Pilots Act* ("FTEPA") to raise the age limit from age 60 to age 65 for Part 121 pilots (Pub. L. No. 110–135, 121 Stat. 1450).

24.     The FTEPA amended 49 U.S.C. § 44729 by changing the language regarding mandatory retirement to allow Part 121 pilots to serve in multicrew operations until attaining age 65. Although there was originally a "pairing" requirement that a pilot in command who reached age 60 had to be paired with a pilot under age 60 in international commercial air transport, that requirement was removed by the FAA in 2015 after it was determined to be unnecessary. The removal of this restriction allowed all pilots serving on airplanes in international commercial air transport that had more than one pilot to serve until age 65.

25.     As with the Age 60 Rule, there was no definitive and credible medical, scientific, or aviation evidence to support a valid claim that safety concerns required a mandatory retirement age for Part 121 pilots at 65. The arbitrary Age 60 Rule was simply replaced with the arbitrary Age 65 Rule. In fact, as early as 1981, a report by the National Institute on Aging concluded that

the Age 60 Rule was "indefensible on medical grounds" and there was no evidence to support any age for mandatory pilot retirement.

26.     Another study by the National Institutes of Health (NIH)/National Academy of Medicine similarly concluded that there was no medical basis for the Age 60 Rule. And in 2006, the president of The Civil Aviation Medical Association (CAMA) issued a scathing opinion on the flawed research the FAA used to support the rule, stating that "there has never been any medical or scientific basis" to justify the rule and it represents "ageism at its worst."

27.     Pilots undergo a more frequent and higher level of testing than any other high-stakes profession. Frequent medical testing identifies health issues that would disqualify a pilot from flying. FAA regulations require Part 121 Pilots aged 60 and over to have a first-class medical certificate, which must be renewed every six months after examination by an FAA-approved Aviation Medical Examiner (AME). Pilots aged 40 and over are required to have an EKG every 12 months.

28.     Pilots also undergo recurrent ground school and simulator training every nine months (including proficiency check rides tests), and rigorous training and qualification programs approved by the FAA. The frequent simulator assessments verify pilots' continued competence and flight skills which provide an evidence-based measure of a pilot's decision-making, reaction time, communication, and overall performance. The medical evaluations and simulator assessments provide a measure of a pilot's competency and continued fitness to fly regardless of age.

29.     By the time Congress adopted the Age 65 Rule, information regarding both the prevalence of pilot incapacitations and the level of associated risk had increased. The incidence of pilot incapacitation is extremely rare, occurring less than 0.45 times per 1,000,000 flight hours.

When ICAO adopted the age 65 standard in 2006, it concluded that the risk of two older pilots becoming medically incapacitated at the same time is one per trillion hours, a risk so low that it can safely be disregarded.

30.     In addition, most pilot incapacitations cannot be prevented with an arbitrary age limit because they are caused by conditions such as gastroenteritis (food poisoning), laser strikes, headaches, and sinus problems, all of which can occur regardless of a pilot's age.  Although extremely rare, pilots are trained to manage these situations safely in the event they do occur.

31.     Cardiovascular mortality has decreased by more than 50% since the Age 60 Rule was enacted, and the average life expectancy has increased by almost a decade. Medical and technological advances have made it easier to detect and treat health conditions at early stages, greatly reducing the risk that pilots will experience an event that compromises safety in flight.

32.     In its May 24, 2007 "ALPA Sets New Course on Age 60" announcement, ALPA reported that it changed its stance on the Age 65 Rule and voted to "end the union's longstanding support for the FAA Age 60 mandatory retirement age for airline pilots." It did so "[i]n the face of concerted efforts to change the rule in Congress and the FAA" (i.e., ALPA knew the legislation was going to pass) so that the ALPA's Executive Board could direct "that union resources be committed to protecting pilot interests by exerting ALPA's influence in any rule change."

33.     ALPA did not change its stance on the Age 65 Rule in 2007 based on scientific or safety studies proving the safety of raising the pilot retirement age to 65. In fact, among the priorities of ALPA at the time was to oppose any additional age-related diagnostic testing in the new Age 65 legislation. ALPA implicitly acknowledged that there was no credible evidence establishing that older pilots have higher risks to safety than younger pilots which would require additional testing.

34.     As ALPA wanted, 49 U.S.C. § 44729(g)(1) provides that a Part 121 pilot "shall not be subject to different medical standards, or different, greater, or more frequent medical examinations, on account of age unless the Secretary [of Transportation] determines (based on data received or studies published after the date of enactment of this section) that different medical standards, or different, greater, or more frequent medical examinations, are needed to ensure an adequate level of safety in flight."

35.     This provision indicates Congress' and the FAA's belief that older pilots do not need to be evaluated under a standard different from younger pilots (i.e., older pilots are not more susceptible to health risks that cannot be determined through the normal pilot medical testing routine). Upon information and belief, the Secretary of Transportation has not determined that different, greater, or more frequent medical examinations are needed to ensure an adequate level of safety in flight since the Age 65 Rule was adopted.

36.     Nine countries have adopted a pilot retirement age over 65, including Canada, Australia, Japan, New Zealand, and Brazil. Despite having raised their retirement age for pilots, these nine countries have not experienced any increase in safety-related reportable flight incidents.

37.     The period since raising the age limit from 60 to 65 has been the safest in aviation history. Since the adoption of the Age 65 Rule, there has been no evidence that increasing the age limit compromised safety, or that increasing the age limit beyond 65 will increase safety risks in any significant way.

**B.      The Covid-19 Pandemic and Ongoing Pilot Shortage.**

38.     The United States currently faces a severe pilot shortage exacerbated by the forced retirement of older and more experienced pilots. In the years leading up to the Covid 19 pandemic, many airline pilots were nearing retirement and far fewer new pilots were entering the field. When

the pandemic hit and air transit was forced to shut down, many airlines offered the older pilots the option of early retirement to cut costs, furthering the pilot shortage.

39.     As the aviation industry resumed operations following the pandemic, industry-wide workforce shortages, most significantly the shortage of pilots, resulted in increased delays, flight cancelations, and reduced routes. Many airlines were left without sufficient qualified pilots to fly their planes.

40.     Today at least 310 airports in the United States (about 72%), have lost on average 26 percent of their flights. This reduction in service is due to the pilot shortage and has occurred despite rising passenger demand, a return to pre-pandemic pilot employment levels, and historic pilot pay raises. In just the last few years alone, 14 U.S. airports have lost all scheduled, commercial air service.

41.     Demand for pilots is far outpacing the available supply, further impacting the existing shortage. In addition, the pilot population is aging, and there are approximately 70 percent more pilots aged 43-64 than there are pilots aged 21-42. Nearly half of today's qualified pilot workforce faces mandatory retirement within 15 years.

42.     As a result of the Age 65 Rule requiring Part 121 pilots to retire the day they turn 65, it is estimated that more than 14,000 of the most experienced pilots will be forced out of the profession over the next five years.  The Bureau of Labor Statistics estimates that more than 16,800 new pilots will be needed in the U.S. each year for the next decade, and Boeing estimates that 602,000 new pilots will be needed worldwide over the next two decades.

**C.     The Let Experienced Pilots Fly Act ("Age 67 Rule") and International Support for**
<u>**Raising the Pilot Retirement Age Beyond 65.**</u>

43.     On March 21, 2023, Senator Lindsey Graham and six bipartisan co-sponsors
introduced the *Let Experienced Pilots Fly* Act to address airline flight cancellations caused by a
shortage of pilots. As stated in the March 2023 press release:

> With baby boomers making up half of the airline pilot population, roughly 5,000
> fully qualified pilots will be forced to retired within the next two years and the
> problem will grow even more acute in the years after. The wave of forced pilot
> retirements continues even as hundreds of flights are being cancelled due to a
> shortage of available pilots and crews.
>
> In 2007, the retirement age for pilots in the United States was raised from 60 to 65
> after medical reports concluded age had an 'insignificant impact' on performance in
> the cockpit and there were safety precautions already in place to prevent accidents
> in case of incapacitation. Nothing in this legislation changes current safety and
> proficiency procedures for commercial pilots. Pilots will continue to be held to an
> incredibly high standard to ensure passenger safety.
>                    *              *              *
> *There is a severe and growing pilot shortage in the United* States. *Every air traveler*
> *sees and feels the impact when they go to the airport," said Senator Graham. "One*
> *of the biggest* causes *of air delays* is a *lack of available crews. Lately, if your plane*
> *actually leaves on time, you feel like you won the lottery. My legislation extends the*
> *mandatory retirement age two years and will make an immediate and appreciable*
> *difference keeping highly-trained pilots on the job. The traveling public deserves*
> *better than what they are currently getting. Our bill moves the needle in the right*
> *direction to address the critical pilot shortage.*

44.     On July 20, 2023, the U.S. House of Representatives voted to pass legislation that
would raise the mandatory commercial pilot retirement age from 65 to 67. The Senate's version of
the bill introduced by Senator Graham (the LEPF Act, S. 893):

> • Allows pilots to serve in multicrew Part 121 operations until reaching age 67.
>
> • Continues to require that pilots over the age of 60 maintain a first-class medical
> certification which must be renewed every six months.
>
> • Requires air carriers to continue using pilot training and qualification programs approved
> by the FAA.

• Continues to prohibit "different medical standards, or different, greater, or more frequent medical examinations" for pilots on account of age.

45.     In the Fall of 2022, the International Air Transportation Association (IATA) presented a paper at the ICAO 41st Session of the ICAO Assembly requesting that ICAO resume discussions of raising the pilot age limit (started before the pandemic in 2019) to address the international pilot shortage and to eliminate unnecessary barriers that constitute de facto discrimination. IATA is the trade association of the world's airlines, representing some 300 passenger and cargo airlines in over 120 countries (including U.S. carriers) and carrying 83 percent of the world's air traffic. According to IATA, the paper was supported by countries (Member States) in attendance.

46.     In its September 6, 2023, letter to the U.S. Senate Commerce Committee, IATA stated:

> After careful examination of existing data, IATA proposed a working paper that was adopted at the 41st International Civil Aviation Organization (ICAO) Assembly to require ICAO, utilizing industry contribution, to assess the latest scientific evidence relating to commercial multi-crew pilot age restrictions. This work is ongoing, with some data indicating that increasing, indeed even eliminating, arbitrary pilot age limits would not have any negative safety implications. It is also important to note that the instance of subtle pilot incapacitation is extremely low. The continued upward trend in life expectancy, associated with evolving and improved crew condition awareness training, the use of modern simulators to train and assess pilots' performance, and the increased availability of advanced flight deck automation, have further reduced traditional risk concerns.

47.     Although IATA issued its letter supporting the increase in the pilot age limit from 65 to 67, its position is that pilot age limits should be eliminated completely in favor of evidence-based medical and proficiency evaluations.

48.     In conjunction with IATA's request that ICAO resume consideration of the issue, ICAO is also examining whether to raise the commercial pilot age limit beyond 65. As discussed

at ICAO's August 2023 meeting in Montreal (which was attended by ALPA representatives), there is a growing consensus within ICAO that better retention of experienced pilots is essential.

49.     ICAO Medical Director, Dr. Ansa Jordaan, stated at its August 2023 meeting that ICAO recognizes the value of experience and the risks associated with the loss of experienced pilots and that standards regarding pilot retirement should not be based on an arbitrary number but should be driven by data. Dr. Jordaan reported that there is no indication of increased risk from the data she reviewed.

50.     Based on the facts and data since the age 65 standard was adopted by ICAO in 2006 (including the large number of pilots over age 65 already safely involved in international commercial and non-commercial operations) and the growing consensus at the international level that decisions about a pilot's fitness to fly should be competency-based and that older and more experienced pilots should be retained rather than forced to retire, there is no reason to think that ICAO will not raise the age limit to 67 (or higher). And ICAO does not have the authority to overrule the policies set by national aviation authorities should any ICAO Member State decide to raise its mandatory pilot retirement age.

**D.      ALPA'S Opposition to the Age 67 Rule and Its False and Misleading Statements Made as Part of Its "Anti-Senior Pilots" Campaign.**

51.     Instead of objectively considering updating its retirement age policy position–which is known to be based on outdated conditions and presumptions–ALPA is exploiting the political value of catering to an increasing number of younger pilot members who want to take the positions of the older pilots who are arbitrarily forced to retire by the existing Age 65 Rule. ALPA has intentionally crafted and promulgated a set of arguments known to be untrue as to safety concerns and purported airline implementation obstacles (among other things).

14

52.     Aware of Congressional efforts to raise the mandatory pilot retirement age beyond 65 (which began in 2022 after the end of the Covid pandemic when airline travel demand returned in the face of a severe pilot shortage) and in an effort to appease its younger members, ALPA announced in a May 19, 2022 press release entitled "Operational Ramifications Will Increase Costs and Introduce Unnecessary Risk" (still available on its website): "At today's 130th Regular Executive Board of [ALPA], pilot leaders adopted a resolution opposing any attempts to increase the retirement age for professional airline pilots." This age-discriminatory policy was adopted without input from the pilots represented by ALPA.

53.     ALPA's President at the time, Capt. Joe DePete, claimed: "ALPA strongly opposes this proposed legislation as there is no reason to change the retirement age today and doing so would only increase costs for airlines as well as introduce unnecessary risks to passengers and crew alike." ALPA's statement was intentionally incendiary and without any legitimate basis for claiming that "unnecessary risks to passengers and crew alike" would result if older pilots were permitted to fly two more years.

54.     Equally outrageous, ALPA's speculative claim that the proposed legislation "would only increase costs for airlines" demonstrates and emphasizes the breach of its duty of fair representation *owed to its pilot members*. ALPA's claim–even assuming it was true–is not an argument to be made by a labor union but would instead be an argument to be made *by the airlines*. *But the airlines are not the ones opposing the proposed Age 67 Rule.*

55.     ALPA's statements in its May 19, 2022, press release that raising the pilot retirement age would only increase costs for airlines as well as introduce unnecessary risks to passengers and crew alike discussed in the preceding three paragraphs have been made by ALPA

15

numerous times in various forms and sources, including within six months prior to the filing of this lawsuit.

56.      As part of its widespread and ongoing anti-senior pilot campaign, ALPA has engaged in direct attacks on the older, minority group of ALPA members by falsely claiming that older pilots are less capable of flying Part 121 aircraft safely and are more dangerous in the cockpit. For example, ALPA placed a full-page advertisement in the Wall Street Journal (a copy of which is shown on the next page) with the following message:

> CUT AIR SAFETY REGULATIONS AND YOU MAY AS WELL TRY TO FLY LIKE THIS.
>
> **Congress should not raise the pilot retirement age and weaken air safety standards. Lowering the bar on air safety would be a catastrophic mistake.**
>
> America has the safest skies in the world because we have the toughest safety standards in the world. Yes, Congress is considering eroding those standards and introducing more risk by raising the mandatory pilot retirement age without even a safety study and weakening strong pilot training rules. Don't compromise safety.



57. The obvious implication of ALPA's "one-wing" advertisement–which is also currently posted in similar form on at least ALPA's LinkedIn account–is that pilots 65 and over are dangerous and incapable, and flying with them is riskier. ALPA has no legitimate basis for making that claim. ALPA's one-wing advertisement also falsely implies that adopting an Age 67 Rule necessarily means that air safety regulations will be compromised. The injury to older pilots of these and other flagrantly defamatory statements by ALPA is clear and unmistakable and includes exposing these pilots to an unfair bias by potential future employers that may mistakenly believe the world's largest airline pilot union and its explicit message that older pilots are unsafe.

58. Even if the LEPF Act does pass the Senate and becomes law, ALPA's false claims about the purported dangers from letting older pilots fly stated in its one-wing advertisement and elsewhere are defamatory *per se* and may continue to harm pilots' reputations in their profession throughout their post-Part 121 careers.

59. The defamatory and discriminatory statements and implications made by ALPA in its one-wing advertisement discussed in the preceding three paragraphs have been made by ALPA on many occasions in one form or another, including within six months prior to the filing of this lawsuit.

60. ALPA's false, misleading, and/or factually unsupported statements include "talking points" for ALPA representatives to use in opposing the Age 67 Rule, such as the claims that "Extending the current retirement age to 67 will actually disincentivize future pilots from pursuing flight training" and "Retaining current pilots an additional 2 years would greatly reduce demand for new pilots and leave pilots currently in the training pipeline with no opportunity for employment after a large financial investment to obtain their ratings."

61.     ALPA has no legitimate basis or evidentiary support for making these claims but instead relies on its own biased speculation to favor the younger pilots. The demand for pilots is growing and is expected to continue to grow even if older pilots are allowed to keep flying Part 121 operations. There is no reason to think future pilots would not want to pursue flight training simply because the mandatory retirement age is extended two additional years.

62.     ALPA's flagrant bias against the older members of the union is also clearly shown in another of its "talking points" ALPA uses in opposing the Age 67 Rule. ALPA unashamedly asserts: "*As we try and build the aviation workforce of the future, our focus needs to be on incentivizing young, diverse aspiring workers to enter the field, **not hanging on to 65 year old's** [sic] for another two years. Age 67 is just a distraction that consumes time, energy and effort that could be better utilized focusing on the next generation of workers*."

63.     The consumption of "time, energy and effort" by ALPA refers to the massive resources being spent on its anti-senior lobbying campaign. ALPA's statements that it does not want to "hang on to 65-year-olds" and would prefer to spend the union's resources focusing on the younger ALPA members–*including resources obtained from pilots close to turning 65 who have paid ALPA dues their entire careers*–is further evidence of ALPA's shameless age discrimination against its senior members.

64.     ALPA's false, misleading, and/or factually unsupported statements in ALPA's talking points discussed in the preceding four paragraphs have been made by ALPA on many occasions in one form or another, including within six months prior to the filing of this lawsuit.

65.     ALPA's anti-senior pilot campaign also includes false statements made by its leadership on television and radio broadcasts. For example, in an interview given on NPR in September 2023, Jason Ambrosi, the current President of ALPA, claimed: "The last time the

retirement age was raised, from 60 to 65, there was a significant study over a five-year period by ICAO, the International Civil Aviation Organization, which supported raising the age. The FAA, at that point, followed suit and raised the age from 60 to 65 here in the United States. This time, the international standard remains 65, and there hasn't been any study to say that raising the age is safe or is not safe."

66.     The obvious and necessary implications of Mr. Ambrosi's statements is that ICAO, in previously adopting the raise in the pilot retirement age from 60 to 65, conducted a five-year study that proved raising the age would be safe and a similar study is now needed to prove that raising the age an additional two years would be just as safe. As ALPA knows (or should know based on reasonable diligence), ICAO did *not* conduct a five-year study proving that moving the pilot retirement age to 65 would be as safe as the previous arbitrary cutoff of 60. To the contrary, as stated in an FAA 11/29/06 Age 60 Aviation Rulemaking Committee Report to the FAA examining the issue:

> No compelling safety argument in favor of increasing the maximum age limit has been advanced by its proponents. It is the working group's view that the new ICAO standard was adopted through an inadequate process. There was no structured, detailed opportunity to solicit information regarding experiences or problems associated with pilots flying beyond 60 years of age. There was no safety risk analysis of the effect of a change to the standards, only a cursory review of studies done by other organizations was conducted.

67.     Contrary to Mr. Ambrosi's statements, ICAO only conducted an international survey of flight safety data prior to adopting the age 65 standard and found *no evidence to support an upper age limit of 60 years of age for commercial pilots*, and medical and aging experts agreed there was no medical rationale for the arbitrary Age 60 Rule. Rather than proving raising the age from 60 to 65 was safe and had few risks, ICAO recommended raising the age limit because it found that there was no legitimate basis to keep the previous arbitrary age 60 cutoff.

20

68.     In fact, the FAA Age 60 Aviation Rulemaking Committee Report acknowledged "that the new [ICAO age 65] standard simply resulted in the replacement of one age limit with another age limit." In other words, age 65 was just an arbitrarily chosen number. After 17 years of the safest era of commercial aviation history, there continues to be no credible evidence showing why the arbitrary age 65 cutoff should *not* be raised again (although the proposed age 67 would still be an arbitrary cutoff).

69.     Based on the data and information available since the age 65 standard was adopted, there is similarly no credible evidence on which ALPA can rely to reasonably claim that the current arbitrary age 65 cutoff must be maintained for safety's sake. ALPA knows this but instead chooses to discriminate against the older pilots it represents. ALPA simply misrepresents what happened when the pilot retirement age was raised from 60 years old and the fact that the age 65 cutoff was an arbitrary number supported by no medical or safety evidence in its efforts to favor ALPA's younger majority pilot group over the older minority pilot group.

70.     ALPA also makes false and misleading claims in opposition to a new Age 67 Rule in articles on its website published within six months of the filing of this lawsuit, such as one entitled: "Why ALPA Opposes Extending U.S. Pilot Retirement Age." ALPA states:

> Global flying standards are set by the International Civil Aviation Organization (ICAO), which has determined that the mandatory airline pilot retirement age for multicrew operations should be 65. Extending this age limit in the United States without any analysis, validation, studies, or research on its impact-as was conducted years before the current retirement age was set by ICAO-would put the U.S. in conflict with ICAO and result in older airline pilots being barred from operating international flights. Compelled to domestic-only operations, these senior pilots would likely bottleneck an airline's training capacity as they retrain and requalify on new aircraft. A ripple effect would ensue as less-senior pilots would be bumped from their aircraft, adding to a carrier's training demands and resulting in reduced pilot utilization and flying as the airline attempts to recover.

71. ALPA similarly claims in its "Debunking the Myths About Raising the Pilot Retirement Age" article on its website since July 2023:

Myth: There are no added risks to allowing pilots to fly past age 65.

Fact: There are no scientific or safety studies demonstrating this assertion. Unilaterally raising the airline pilot retirement age from 65 to 67, without scientific study or safety research, would introduce more risk, or at a minimum a new and unknown risk, into our aviation system, likely accompanied by disruption to airline operations, additional flight delays and cancellations, and increased ticket prices for passengers.

72. A "myth" obviously and necessarily implies that the opposite is true. Without any legitimate factual support to justify its obvious bias against older pilots, ALPA asserts there *are* "added risks to allowing pilots to fly past age 65." This statement falsely implies that there were scientific or safety studies showing that the current age 65 limit was more than just an arbitrary cutoff (which it was) and scientific evidence and observable data demonstrated that pilots should be forced to retire at 65 for safety's sake. As stated elsewhere herein, the age 65 standard was adopted by ICAO in 2006 and the United States in 2007 because there was no credible evidence showing why the age limit should *not* be raised from 60 to 65.

73. In addition, ALPA's claim that raising the age from 65 to 67 would cause a "ripple effect . . . as less-senior pilots would be bumped from their aircraft" is based on nothing more than speculation and conjecture. In fact, if ICAO does not change its current age 65 standard–and ignoring the fact that nine ICAO Member States *already* allow commercial pilots to fly past age 65–senior pilots who would be only able to fly domestically would actually "bump up" the junior pilots beneath them to the now-vacant international flights.

74.     ALPA's statements in paragraphs 70-71–which are continually made by ALPA in various forms and sources including within six months of the fling of this lawsuit–are also false and misleading because:

(i)     only about 10-15% of U.S. flights are international;

(ii)    there are a substantial number of senior pilots being forced to retire who are already flying domestic only aircraft because of their personal preferences;

(iii)   there are already United States airlines that primarily fly domestic only or that have a large portion of their flights domestic routes (United Airlines and American Airlines both fly about 50% of their widebody aircraft domestically);

(iv)    the number of training events that are needed when an older pilot is forced to retire because of the arbitrary Age 65 Rule are *more* than the number of training events that would be required if a pilot moved from an international aircraft to domestic only;

(v)     if the Age 67 Rule was passed and bilateral agreements were made with foreign countries that have similar legislation allowing pilots to fly over age 65 (bi-lateral agreements have already been made between ICAO Member States), there would be *zero* additional training events or associated costs;

(vi)    according to ICAO's website, a pilot license issued by a Member State that allows a commercial air transport pilot to fly at age 65 or above may be used in any Member State whose airspace is used if that State has authorized it; and

(vii)   as discussed above, ICAO will likely also be adopting a new age 67 (or older) rule, making ALPA's whole "ripple effect" argument moot.

75.     Moreover, ALPA has no legitimate reason to claim there will be "reduced pilot utilization and flying," "disruption to airline operations, additional flight delays and cancellations, and increased ticket prices for passengers" if older and more experienced pilots are allowed to fly two more years. ALPA simply does not know *how* the airlines will administer the potential return to domestic-only flying by pilots who would now be able to fly until age 67 under proposed legislation and there are multiple potential options available. ALPA's false statements again demonstrate its improper reliance on pretextual arguments that–*if* they had any merit at all–should

be made by third parties, *not* by a union whose primary responsibility is to fairly and in good faith promote the interests of its pilot members.

76.     Further promoting its false and pretextual "safety reasons" for opposing the Age 67 Rule, ALPA makes statements in its "Fact Sheet" on its website, in social media posts, and in a January 2023 letter to Congress such as: "The European Union Aviation Safety Agency [EASA] concluded in 2019 that the retirement age should not be increased beyond 65 for pilots in multicrew airline operations," and "Most importantly, the current international age limit is based on safety. According to numerous studies, including a study by EASA in 2017, there is an increased risk of cardiovascular issues, diabetes, and cognitive decline."

77.     Although ALPA often cites "a study by EASA" as a purported "safety" reason not to change the current Age 65 Rule, the statements in the preceding paragraph and its supposed reliance on the study are false and misleading for several reasons. First, on information and belief, EASA has not issued *any* opinion in opposition to raising the eligible commercial pilot age from 65 to 67 (or beyond).

78.     Although a study was commissioned by EASA in 2017 and produced a "Final Report" in 2019, the Final Report very clearly informs its readers that it only contains the opinions of its authors and clearly states that *EASA did <u>not</u> adopt, endorse, or in any way approve its contents*. The first page of the report contains the following Disclaimer, the contents of which could not have reasonably been misunderstood by ALPA:

**Disclaimer**

This study has been carried out for the European Aviation Safety Agency by an external organization and expresses the opinion of the organization undertaking the study. It is provided for information purposes only and the views expressed in the study have not been adopted, endorsed or in any way approved by the European Aviation Safety Agency. Consequently, it should not be relied upon as a statement,

as any form of warranty, representation, undertaking, contractual, or other commitment binding in law upon the European Aviation Safety Agency.

79.     In addition, the report on which ALPA often relies for its purported safety claims very clearly states just a few pages after the Disclaimer quoted above:

> The current age limitations for commercial air transport pilots (CAT) required by Regulation (EU) No 1178/2011 were taken over from ICAO Annex 1. For single-pilot CAT operations the limiting threshold is the age of 60 and in multi-pilot CAT operations, pilots can continue to operate until the age of 65. **These age limits were developed by the Agency without conducting a specific impact assessment on safety, health or social issues.** [Emphasis added]

80.     Moreover, the authors acknowledged limitations throughout their report, including data that were outdated and did not reflect current health trends, small sample sizes, and generalizations from dissimilar populations. The report was focused solely on age and incapacitation and did not take into account the mitigating effects of experience or safety management systems. The study also did not include analyses regarding increasing the age limit in multicrew operations on an incremental basis, but considered whether the risk of incapacitation can be mitigated by health screenings rather than any arbitrary age. As a result, data were included for individuals well above age 67–including those in their 70s, 80s, and older.

81.     The primary author of the Final Report subsequently published the results in a European Union cardiology journal and concluded that the age limit for pilots in multi crew operations *could* be extended beyond 65 using the stratified risk assessments identified in the report. The FAA uses assessments as part of medical protocols and can require additional screenings as part of first-class medical examinations for pilots over 65 if deemed appropriate.

82.     Finally, ALPA's statement that "[a]ccording to numerous studies, including a study by EASA in 2017, there is an increased risk of cardiovascular issues, diabetes, and cognitive decline" is false and misleading because the EASA report and, upon information and belief, the

25

other "numerous studies" ALPA purportedly relies on do <u>not</u> conclude there is a significant increased risk of cardiovascular issues, diabetes, and cognitive decline for commercial pilots between the ages of 65 and 67 to support a legitimate claim by ALPA that raising the retirement age from 65 to 67 will result in an increased and dangerous risk in multi-crew Part 121 operations. It is also worth emphasizing again that the proposed Age 67 Rule will still keep the ICAO (and current United States) standard that flights with any pilots over age 60 require more than one pilot.

83.     ALPA's false, misleading, and/or factually unsupported statements discussed in the preceding seven paragraphs have been made by ALPA on many occasions in one form or another, including within six months prior to the filing of this lawsuit.

84.     ALPA also states in its "Debunking the Myths About Raising the Pilot Retirement Age" article currently published on ALPA's website:

Myth: ALPA had no issue with raising to 65, why 67?

Fact: In 2007, the FAA raised the pilot upper age limit age to 65 to align with ICAO standards, which were already at 65. The ICAO standard is still set at 65, which means the two situations are not comparable. Because of a lack of scientific or safety studies addressing the potential use of over age 65 pilots in international air carrier operations any consideration of raising the upper age limit for pilots at ICAO is very likely years away, if at all.

85.     As noted above, the pilot age standard was raised from 60 to 65 in 2006 by ICAO and in 2007 by Congress because there was "a lack of scientific or safety studies" showing that raising the age was *not* safe (i.e., the question was not "why," but "why not?"). Contrary to ALPA's claim, Congress mandated the FAA to adopt the Age 65 standard.

86.     Given that there are *still* no scientific or safety studies showing that a retirement age of 67 for Part 121 pilots would be less safe than the current arbitrary age of 65, as well as ICAO's current reconsideration of the age 65 standard at the behest of IATA (which ICAO had

actually begun reexamining in 2019 before the Covid pandemic hit), ALPA's claim that "any consideration of raising the upper age limit for pilots at ICAO is very likely years away, if at all" is not only unsupported, it is false. In fact, multiple aeromedical and operational experts involved in the August 2023 ICAO meeting regarding increasing the pilot age limit discussed raising the age to 70, and IATA advocates the removal of *all* age restrictions.

87.    ALPA's claim that any action by ICAO to raise the age limit at the international level is "very likely years away, if at all" is untenable, pretextual to hide its true motivations, and emphasizes ALPA's strategy of delaying as long as possible the decision to increase pilot retirement age beyond 65 and thereby effectively preventing the adoption of the LEPF Act that would establish the new Age 67 Rule.

88.    ALPA's false, misleading, and/or factually unsupported statements regarding the purported scientific and safety studies conducted by IACO before it raised the pilot retirement age standard in 2006 discussed in the preceding four paragraphs have been made by ALPA on many occasions in one form or another, including within six months prior to the filing of this lawsuit.

89.    ALPA also represents thousands of commercial pilots in Canada–which has no mandatory pilot retirement age–through ALPA Canada. ALPA, however, is not advocating that Canada adopt an age 65 mandatory retirement age despite ALPA's claims in Congress and the media in this country that pilots aged 65 or more are less safe than younger pilots and ALPA's assertions that its opposition to raising the pilot retirement age in the pending legislation is purportedly based on safety concerns. This is further evidence that ALPA's purported "safety concerns" about raising the pilot retirement age are pretextual to hide its true motivations to advocate for the interests of the politically more powerful younger majority members at the direct expense of the older minority pilots represented by the union.

27

90.     ALPA also tries to justify its anti-senior pilot campaign by falsely (and incredibly) claiming that the collective bargaining agreements previously negotiated by the unions on behalf of their member pilots will have to be "reopened" because they are so good to pilots now that it would be unfair to the airlines to allow them to remain in place. For example, ALPA claims in an article on its website, "Tell Your Senators: Oppose Any Increase to Airline Pilot Retirement Age in FAA Reauthorization:"

> Raising the retirement age beyond 65 would not be in compliance with international standards and therefore disrupt U.S. airline global operations. It would upend pilot bidding, reduce pilot utilization, create training backlogs, imperil flight operation, expose your union and airlines to significant legal liability, and ultimately require hard-fought-for collective bargaining agreements to be reopened to deal with this issue and its ramifications. This will not increase the supply of pilots. Rather, it will come at a high price with respect to the cost of collective bargaining agreements, pilot labor, and air carrier costs and flying—all of which will be passed on to consumers.

> Pilot bidding is based on seniority, and the most desirable and lucrative opportunities are international widebody flying. The standard established by the International Civil Aviation Organization (ICAO) does not allow a pilot aged 65 or older to fly in international airline operations. Increasing the retirement age presents multiple problems not anticipated by either the airlines or their champions in Congress, such as having a group of pilots who are not legal to fly the most desirable routes or returning from retirement with the seniority, by contract, to demand such flying. Returning pilots or those over the age of 65 who stay on seniority will be able to bid on routes they are unable to perform and will be paid for not flying or use long-term disability, sick leave, and large vacation balances in their final years of their career to not fly.

> This will result in contractual grievances and litigation that may take years to resolve. When a legal resolution is finally provided, it will likely require unions and airline management to restructure bidding, the micromanagement of flight operations based on age, and substantial labor disputes. Under a scenario where there is contractual resolution, it will cause displacement of more junior pilots and a substantial training backlog as pilots must retrain and requalify.

91.     There are many reasons why ALPA's above-quoted statements are false and misleading (not all of which will be addressed here), which statements are clearly presented as

statements of fact as opposed to mere opinion after a careful and objective examination of the issues.

92.     For example, ALPA has no reasonable bases to claim that raising the pilot retirement age two more years will "upend pilot bidding, reduce pilot utilization, create training backlogs, imperil flight operation, expose your union and airlines to significant legal liability, and ultimately require hard-fought-for collective bargaining agreements to be reopened to deal with this issue and its ramifications."

93.     ALPA's Delta Airlines MEC has admitted that ALPA does not know how changing the pilot retirement age would affect pilot contracts previously negotiated by ALPA. And, even if future negotiations did become necessary, ALPA is a union whose primary responsibility is to negotiate contracts with the airline employers *on behalf of its member pilots*. This is one of the things ALPA does for which it exacts millions of dollars each year in dues from the pilots it represents.

94.     ALPA's statements quoted in paragraph 90 are not only insufficiently supported by facts and data, ALPA is just using these speculative claims to do all that it can to get rid of the disfavored "65-year-olds" to make way for the "younger generation" whose annual dues to ALPA will provide the union significantly more revenue over the course of their careers than the dues the union will receive from older pilots under the two year extension that would occur if the Age 67 Rule is enacted.

95.     In addition to being unsubstantiated, ALPA's claim that "returning pilots or those over the age of 65 who stay on seniority will be able to bid on routes they are unable to perform, and will be paid for not flying or use long-term disability, sick leave, and large vacation balances in their final years of their career to not fly" again raises speculative cost issues *for the airlines*

29

and are not legitimate concerns of ALPA under the circumstances (e.g., the airlines are not on the verge of bankruptcy thus threatening the jobs of ALPA's pilots). ALPA's duties do not include ensuring costs are as low as possible for airline management. ALPA's duty to its membership is to negotiate collective bargaining agreements in the best interests of all its members.

96.      ALPA's false, misleading, and/or factually unsupported statements discussed in the preceding six paragraphs have been made by ALPA on many occasions in one form or another, including within six months prior to the filing of this lawsuit.

97.      ALPA's blatantly false statements as part of its anti-senior pilot campaign continue to be made in the media, public forums, and to legislators. For example, on January 15, 2024, The Wall Street Journal published a Letter to the Editor written by Jason Ambrosi, ALPA's President, in which he states:

> The International Civil Aviation Organization mandates–and isn't reconsidering–that pilots retire at age 65. As a result, U.S. pilots over 65 couldn't fly beyond U.S. borders. Because more-senior pilots typically fly internationally, the proposal, which the FAA opposes, risks having airlines pay for work that pilots can't perform or retraining them to fly domestic-route aircraft.

98.      Mr. Ambrosi's statements quoted above are false, including his claims that ICAO mandates the pilot retirement ages for its Member States, ICAO is not considering raising the pilot retirement age as requested by IATA, the FAA *opposes* raising the pilot retirement age, and U.S. pilots over 65 could not fly beyond U.S. borders without ICAO's permission. ICAO Member States can decide for themselves their pilots' mandatory retirement ages and seek permission from other Member States to fly into their airspace if those States' pilot retirement ages are lower. As the European Parliament states in its *Fact Sheets on the European Union - 2023*:

> At international level, the International Civil Aviation Organization (ICAO) is responsible for setting minimum aviation safety standards, but these are not binding and so compliance is mainly dependent on its member states' goodwill.

99.     Regarding ALPA's and Mr. Ambrosi's false claim that the FAA opposes raising the pilot retirement age to 67, Michael Whitacker, FAA's Administrator, recently testified before the Senate Committee on Commerce, Science, and Transportation in February 2024 that the FAA takes no position on the Age 67 Rule and will implement whatever Congress directs. ALPA, nevertheless, continues to claim that the FAA opposes the retirement age change as part of its anti-senior pilot campaign.

100.     ALPA's and Mr. Ambrosi's arguments in opposition to the Age 67 standard based on the potential that airlines will be required to pay pilots "for work [they] can't perform" or retrain senior pilots to fly domestic-only aircraft are, as discussed above, not legitimate union concerns and are therefore arbitrary and made in bad faith, especially considering that the contracts that may produce these results were previously negotiated by ALPA *for the benefit of the pilots the union represents*.

101.     ALPA's cavalier attitude towards its duty of fair representation, especially its disregard of its duties towards the union's minority interests, can be summed up by the following statement attributed to ALPA in an August 22, 2023, Reuters article entitled, "Focus: US airline pilots fight their unions to increase retirement age":

**ALPA said its stand on age is the result of a "democratic process" and reflects "the will" of its members.**

102.     ALPA's often repeats its claim that its opposition to the Age 67 standard is mandated by the majority of its members despite the fact that ALPA has never asked its members to vote on the issue. Jason Ambrosi, for example, when responding to inquiries regarding ALPA's position on the Age 67 Rule often claims, "While I have discretion on some issues, this is one where the membership has provided clear direction to leadership."

31

103.     In any event, and contrary to ALPA's apparent belief, the union is *not* supposed to make its decisions based on the "will of the majority" but is instead required to fairly and in good faith serve the interests of all ALPA pilots without hostility or discrimination toward any. It is this duty of fair representation that *protects* minority groups against actions directed by "the will of the majority."

104.     In summary, and as stated in a January 9, 2024, letter to Congress signed by 55 current and former ALPA Elected Representatives, Committee Chairs, and Committee Members who support the pending legislation to raise the pilot statutory retirement age from 65 to 67:

> ALPA's position to maintain age 65 is flawed and does not represent its entire membership. It is based solely on the earnings aspirations of younger and less experienced members who are eager to replace highly experienced pilots forced to retire at age 65. Their motivation is driven exclusively by the industry's seniority system. As a pilot moves up in seniority, so does their position on the flight deck, with commensurate pay and benefits.

> ALPA's position ignores the perspective of the highly experienced pilots who are qualified and capable of continuing to work until age 67. Many of us flew through the turbulence of 9/11, company bankruptcies, loss of pensions, massive pay cuts, a global economic downturn, and COVID. Now that we are at the peak of our profession, we are being forced out by an arbitrary age because of an outdated law.

> Today the industry is growing at an unprecedented rate. Entry to, and upgrades within, the industry are happening at an alarming pace. Forced retirements of our most experienced pilots are adding to the problem as tens of millions of hours of experience is being forced out of our flight decks. Staffing issues are causing delays, cancellations, stranded passengers, disrupted cargo flow, and the loss of air service in small towns.

> Raising the age from 65 to 67 will provide immediate relief to each of these issues. Additionally, keeping highly experienced pilots on the flight deck longer will help reduce the record number of safety incidents occurring, and provide vital mentorship to the less experienced pilots.

> Each of us volunteered to lead in our union. Some of us were elected Local Executive Council representatives. Some of us were elected to Master Executive Council positions, and some to represent ALPA internationally, at ICAO. All of us are ALPA safety advocates and served our union with the expectation that our union

would act in our best interest as stated in the ALPA mission statement and Code of Ethics. That is not the case on this issue. Instead, our union is lobbying against us.

We call for Congress to promptly raise the retirement age to 67 and for all associated agencies to implement this change immediately.

E.      **ALPA's Duty of Fair Representation**

105.    Plaintiff asserts on behalf of its members a claim against ALPA for ALPA's breach of its duty of fair representation under the Railway Labor Act. Under the RLA, ALPA, as the exclusive bargaining agent of its pilot members, owes to LEPF members a duty of fair representation. This duty encompasses the obligation to serve the interests of all ALPA pilots without hostility or discrimination toward any, to exercise its discretion with complete good faith, and honesty and to avoid arbitrary conduct. The objective of the duty of fair representation is to provide substantive and procedural safeguards for minority members of the collective bargaining unit.

106.    A union breaches its duty of fair representation if, *inter alia,* it intentionally causes harm to an employee, discriminates against an employee or employee group, neglects the interests of a membership minority to advantage the membership majority, or acts for the purpose of benefiting a stronger, more politically favored group over a minority segment of the union.

107.    ALPA's intentional age discrimination against older, more senior pilots is unreasonable. ALPA's duty of fair representation to all its members requires that it make reasonable decisions on its members' behalf.

108.    ALPA has breached and continues to breach its duty of fair representation to LEPF members by, *inter alia*, discriminating against them, expressing hostility and acting with animosity towards them, incorporating lies and deceit in its anti-senior pilot campaign, making bad faith claims of objective advocacy being pursued in good faith and in the best interests of its pilot

33

members, and choosing the interests of the stronger, more politically favored group of younger, more junior pilots over the interests of the older, more senior LEPF members in opposing the pending Let Experienced Pilots Fly Act.

109.     ALPA's statements and actions in connection with its anti-senior pilot campaign are arbitrary, discriminatory, and done in bad faith and constitute the violation of ALPA's duty of fair representation to LEPF members and others.

**F.     ALPA's Wrongful Conduct Arises From Its Union Activities.**

110.     The duty of fair representation owed to the pilots it represents is applicable to all ALPA's union activities. Plaintiff's claims herein arise out of ALPA's wrongful conduct in connection with ALPA's union activities.

111.     ALPA represents on its website (ALPA.org):

What We Do

ALPA represents and advocates for more than 77,000 pilots at 43 U.S. and Canadian airlines, making it the world's largest airline pilot union. **ALPA provides three critical services to its members: airline safety, security, and pilot assistance; representation; and advocacy.** Through unbiased, fact-based evaluation of airline safety and security issues, ALPA works to ensure that the airline industry remains safe. **ALPA represents pilots' views to decision-makers, including Congress and federal agencies**, and ALPA pilot groups have negotiated hundreds of contracts with airlines. [Emphasis added]

112.     ALPA also states on its website:

Mission Statement

**The mission of the Air Line Pilots Association is to promote and champion all aspects of aviation safety throughout all segments of the aviation community; to represent, in both specific and general respects, the collective interests of all pilots in commercial aviation;** to assist in collective bargaining activities on behalf of all pilots represented by the Association; **to promote the health and welfare of the members of the Association before all governmental agencies; to be a strong, forceful advocate of the airline piloting profession, through all forms of media, and with the public at large;** and to be the ultimate guardian and

defender of the rights and privileges of the professional pilots who are members of the Association. [Emphasis added]

113. Among the "three critical services" ALPA claims it provides to its members, ALPA asserts on its website:

> **Advocacy**: ALPA's staff and pilot volunteers consistently represent pilots' views to all airline industry decision-makers, including Congress, Parliament, the White House, and federal agencies. In Washington, D.C. and Ottawa, Ont., ALPA lobbyists successfully promote legislation that helps pilots and work to stop policies that harm pilot interests. National officers and pilot representatives are routinely called on to give their expert opinion before legislative committees and other influential governmental bodies.

114. ALPA also claims on its website that "ALPA's history is steeped in our commitment to advancing the piloting profession and to ensuring that airline travel grows ever safer. As the world's largest pilots' union, ALPA has advanced the piloting profession since 1931."

115. ALPA states further on its website:

> Advocacy
>
> As the largest nongovernmental aviation safety organization in the world, we work to advance all aspects of aviation safety, security, professional assistance, and jumpseating matters, stressing the importance of consistent, dependable, and efficient air transport. We also examine the lifespan of the airline pilot profession, seeking new ways to promote this career to the next generation and improve pilot quality of life, including retirement considerations.

116. Despite its claims that it is the "largest nongovernmental aviation safety organization in the world"–often equating itself with EASA–and that it works to advance all aspects of aviation safety and improve pilot quality of life and retirement considerations, upon information and belief ALPA is *not* collecting data or otherwise researching whether there is any evidence that increasing the pilot retirement age from 65 to 67–just two more years–would be less safe than it is now.

117.    This is because ALPA knows there is no reason to think 65-67 year-old pilots are any less safe than their 64 year-old colleagues and ALPA would rather take the discriminatory and dilatory approach, *assume* older pilots are less safe, and advocate against raising the age until proponents of the Age 67 Rule can prove they are *not*. Contrary to ALPA's statements made as part of its union activities, this was not the approach taken by ICAO, Congress, and the FAA when they raised the pilot retirement age from 60 to 65 in 2006 and 2007.

118.    When ALPA leaders, staff, and pilot volunteers lobby and advocate to members of Congress, governmental agencies, decision makers, and "other influential governmental bodies," they wear their ALPA uniforms, caps, and other indicia that they are purportedly acting on behalf of the union and its members. They rely on the power and influence the union as a whole provides when making statements and taking action rather than on individuals expressing their own personal views on any given matter.

119.    Union dues paid by ALPA members, including LEPF members, are used for ALPA's advocacy activities. ALPA'S advocates are paid for their time using ALPA members' dues and receive flight pay offset for their union advocacy activities. They also receive payments or reimbursements for their hotels, meals, and other expenses incurred for their ALPA advocacy work.

120.    When ALPA advocates against raising the pilot retirement age to the press or on social media such as LinkedIn and X (formerly Twitter)–including ALPA's false, misleading, and unsupported statements made as part of its anti-senior pilot campaign discussed herein–ALPA represents its actions as union activities and uses accounts in its own name, using ALPA's logo and other indicia that its statements and actions are done as a union purportedly representing the interests of its pilot members.

121. When ALPA prepares and uses talking points in its advocacy against the proposed Age 67 Rule or publishes articles on its website and elsewhere like "Why ALPA Opposes Extending U.S. Pilot Retirement Age," "Debunking the Myths About Raising the Pilot Retirement Age," or "Tell Your Senators: Oppose Any Increase to Airline Pilot Retirement Age in FAA Reauthorization," it does so as the exclusive bargaining agent for its pilot members and as part of its union activities for which it receives millions of dollars annually from union dues.

122. ALPA admits that all its lobbying and other advocacy activities are part of its primary union activities for which it exists and operates. All wrongful conduct complained of herein directly arises out of ALPA's union activities to which the duty of fair representation owed to LEPF members and others applies.

### COUNT I – BREACH OF DUTY OF FAIR REPRESENTATION: DECLARATORY JUDGMENT

123. Plaintiff realleges and incorporates by reference paragraphs 1-122 above as if fully set forth herein.

124. At all relevant times herein, ALPA owed, and continues to owe, a duty of fair representation to Plaintiff's members under the Railway Labor Act regarding all actions taken by ALPA relating to the members' employment, including ALPA's advocacy in opposing the Let Experienced Pilots Fly Act pending in the United States Congress.

125. By reason of the facts described above, including without limitation, Plaintiff's allegation that ALPA has breached its duty of fair representation to LEPF members by discriminating against them, expressing hostility, and acting with animosity towards them, a continuing dispute and actual controversy has arisen and now exists between Plaintiff and ALPA concerning ALPA's duty of fair representation owed to its members under the Railway Labor Act.

126.     Plaintiff seeks an order under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that ALPA's conduct complained of herein violated the duty of fair representation that ALPA owes to LEPF members under the Railway Labor Act, including such additional details stated in the prayer for relief.

**COUNT II – BREACH OF DUTY OF FAIR REPRESENTATION: INJUNCTIVE RELIEF**

127.     Plaintiff realleges and incorporates by reference paragraphs 1-122 above as if fully set forth herein.

128.     At all relevant times herein, ALPA owed, and continues to owe, a duty of fair representation to Plaintiff's members under the Railway Labor Act regarding all actions taken by ALPA relating to the members' employment, including ALPA's advocacy in opposing the Let Experienced Pilots Fly Act pending in the United States Senate.

129.     As a result of ALPA's conduct described above, LEPF members have suffered and will continue to suffer irreparable injuries for which there is no adequate remedy at law. Considering the balance of the hardships between the parties, a remedy in equity is warranted, and the public interest will not be disserved by an injunction in favor of Plaintiff, as stated in the prayer for relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court:

A.     Declare that ALPA has breached its duty of fair representation owed to Plaintiff's members under the Railway Labor Act through ALPA's public and private campaign against senior pilots, including through its use of false and misleading statements, statements identified herein that are not reasonably supported by facts, and statements expressing hostility or animosity

38

towards ALPA's senior pilot members, and through its opposition to the Let Experienced Pilots Fly Act;

B.     Order ALPA to retract the false and misleading statements described herein and other false and misleading statements ALPA has made and is making in its opposition to raising the retirement age for Part 121 pilots;

C.     Enjoin ALPA from further discriminating against Plaintiff's members, including by prohibiting ALPA from repeating the false, misleading, and unsupported statements identified herein;

D.     Declare that, considering ALPA's breaches of the duty of fair representation owed to Plaintiff's members complained of herein, ALPA has forfeited any right it may otherwise have possessed to further comment on or oppose the Let Experienced Pilots Fly Act;

E.     Mandate that ALPA inform its officers, employees, agents, and other representatives involved in ALPA's legislative affairs and marketing of the final order of this Court;

F.     Award Plaintiff its attorneys' fees in an amount to be determined herein;

G.     Award Plaintiff its costs of suit;

H.     Grant such other and further relief as is just and proper under the circumstances; and

I.     Retain jurisdiction of this action for a reasonable period after entering a final judgment to ensure that ALPA complies with this Court's orders.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues triable by right by a jury herein.

39

Dated: March 8, 2024

Respectfully submitted,

Let Experienced Pilots Fly, Incorporated

By:  /s/ Daniel J. Becka
    One of its attorneys

Daniel J. Becka (ARDC 6202427)
Law Offices of Daniel J. Becka, LLC
30 N. LaSalle Street, Suite 2727
Chicago, IL 60602
T: (312) 646-1092; F: (312) 278-2455
E: dan@dbeckalaw.com

Peter A. Gaido, Esq. (ARDC 6201144)
Ronald L. Sandack, Esq. (ARDC 6203280)
Justin C. Kanter, Esq. (ARDC 6303651)
Gaido & Fintzen
30 N. LaSalle Street, Suite 2727
Chicago, IL 60602
T: (312) 346-7855
F: (312) 346-8317
E: peter@gaido-fintzen.com
E: ronald@gaido-fintzen.com
E: jkanter@gaido-fintzen.com

*Counsel for Let Experienced Pilots Fly,
Incorporated*